v. Commonwealth of Puerto Rico Congress Well, we were on Chapter 9 until 1984. We don't know the answer of that question right now because we are not under the bankruptcy code right now, but Congress can delegate local officials with power to rule the government, but we submit that the fund is an entity that is over the government of Puerto Rico, that it has plenary powers over the government of Puerto Rico and has the power to overrule decisions and laws of Puerto Rico, and they are appointed by the president and supervised by the president, so they are exercising the public policy of the president upon the people of Puerto Rico and upon the government of Puerto Rico. So that is why we submit that the board is executing, exercising significant federal authority. Sorry about your time. Thank you. Mr. Verrilli, good afternoon. Good afternoon, Your Honor, and may it please the Court, I am Don Verrilli for the board. Since the Constitution was first adopted, Congress has repeatedly exercised its Article 4 authority to structure territorial governments in ways that do not comply with the Appointments Clause and do not comply with the Constitution's other separation of powers constraints. Has it ever appointed governors to any of the present territories without following at least what is stated in the Appointments Clause? Yes, with respect to governors or those like them, I'll give you some historical examples, and then it's also important that even where the Congress has provided for advice and consent proceedings for governors, it has deviated from the requirements of the Appointments Clause for inferior officers in the very same statutes, which makes pretty clear, I think, that Congress never thought that the Appointments Clause applied. Now, with respect to principal officers, the mayor of D.C., equivalent position, really, to a governor, 1802 statute, Congress very early on, 1802, provided that the mayor would be appointed by the president alone. No advice and consent with the Senate. If you look at the structures of D.C. government... Actually, D.C. aside, let's go to territories like Puerto Rico, Guam, the Philippines... So, with respect to territories, Your Honor, yes, with respect to territories, and this is documented in the retiree's brief very effectively, a governor of Louisiana, of Florida, of the Philippines, and the Canal Zone, all initial governors appointed solely by the president. Initial governors. Correct. Don't those statutes read temporarily? They do, but they don't suggest that that was any reason why the Appointments Clause didn't apply. Well, there must be some reason, because after they enacted the statute in every one of those places, and the governors were appointed by the president with the advice and consent of the Senate, in every one of those cases. That's correct, Your Honor, but in no instance do you ever see anyone in the legislative debate or surrounding it saying that the Appointments Clause required it. And I think that's very important, because the very same statutes, and I think this is a critical point, also created offices that would be considered inferior offices if the Appointments Clause applied. And in instance after instance, dozens and dozens of instances in American history, which I will detail, Congress adopted modes of appointment that do not comply with the Appointments Clause. And what that tells you, I think, quite clearly, is that Congress did not believe the Appointments Clause applies. It's not a cafeteria where you can pick the parts that you want to apply and opt out of the parts you don't want to apply. And let me give you some examples, and there are many. If you start with, and this is detailed in a brief in the United States, if you start with the statute creating the territorial government of Wisconsin, it provided that inferior offices would be nominated by the governor and confirmed by the local legislature. It violates the Appointments Clause. If you look at the Jones Act for Puerto Rico, four ministers, including the treasurer, are appointed under the Jones Act by the governor of Puerto Rico. Well, that's effective. They started out being appointed by the president with the advice of the Senate. The governor, the treasurer, the auditor, the attorney general, and all judges of the Supreme Court of Puerto Rico. That's true, Your Honor, but as of 1917, in the Jones Act, the treasurer and three other significant ministers. Well, if I could just focus on the Jones Act, the treasurer is appointed there by the governor of Puerto Rico, not by the president or any other federal official, confirmed by the Senate of Puerto Rico, not the United States Senate. That violates the Appointments Clause, if it applies. And so I think there are so many examples in American history that show you that the Congress did not believe the Appointments Clause governed the structure of territorial governments. I think what's going on quite... Could you now go back to the Forerector Act? So I don't have the answer at the tip of my tongue on the Forerector Act, Your Honor, but... The auditor, the head of the Department of Education, all judges of the Supreme Court of Puerto Rico, were all appointed by the president with the advising consent of the Senate. I appreciate that, Your Honor, but if the... Is that a coincidence that this happens all... I guess what I would say about that, Your Honor, is that if the Appointments Clause applied directly of its own force and required that approach, then the Congress violated the Appointments Clause in 1917 when it changed from what you described in the Forerector Act to provide for the appointment of the inferior ministers in a way that didn't comply with the Appointments Clause. It violated the Appointments Clause again in 1947 when it provided for the direct election of the governor, and it's violated the Appointments Clause in numerous other territorial situations... It violated the Appointments Clause when the governor in 1947 wasn't appointed. He became an... He wasn't... Yeah, he wasn't appointed. He wasn't elected. Well, because respectfully, he had exactly the same duties under the statute on the day after... The governor who was elected in 1947 had exactly the same statutory duties that the governor who was appointed in 1946. Isn't that elections are different than appointments? Yes, I would, and I think... And why would elections be covered by the Appointments Clause? Well, I guess my point, Your Honor, is that you can have elections because the Appointments Clause doesn't apply, because they're not principal officers under the understanding of the Appointments Clause. That's why you can have elections, and that's why the argument that my friends on the other side are making is actually so threatening to the principle of territorial self-government. It's their argument that these people are in the chain of executive command. As you heard Mr. Olson say over and over again, they're functioning as part of the executive branch. They're part of the United States government, and therefore they have to be under the control of the president, and that's why the Appointments Clause... And that's what the Appointments Clause dictates. Mr. Miller, here's... It would help me some if you could hone in with your examples on the sort of specifics that we have here. As I understand it, we have Washington, in other words, the federal government, picking the particular people who will go out and do a job in accordance with federal law, and they will be removable only at the behest of the federal government. That's what we seem to have here, and I'm trying to think, is there any example of that in our country's history? Yes, I can provide, Your Honor, with two, and I do think it's helpful to go over the facts of the D.C. Control Board, because, respectfully, I don't think my friend has it correct. If one looks, and I think the citation for this, you can find in footnote 2 of the Brief of the United States, but if you look at the statute establishing the D.C. Control Board, it looks very much like PROMESA, in that it specifically says that the Control Board is part of the D.C. government and not the government of the United States, and it has all the other provisions like the one you have here. And as my friend Mr. Olson says, but the D.C. Control Board was subject by law to supervision by the Treasury. I'd suggest that he provide the citation for that, because we don't see that anywhere in the statute. The only role that the Treasury Department has, as we see in the statute, is that it authorizes the Control Board to borrow money from the Treasury. The D.C. government already had the authority to borrow money from the Treasury under existing law, so it was just clarifying that the Control Board would have that same authority as the D.C. government. So the D.C. is a perfect analog. Is the D.C. in a different constitutional status than the territories? I don't think it is. Even though they are both covered by the Territorial Clause? So I think technically D.C. is covered by Article I, Section 8, Clause 17, but the Supreme Court has said repeatedly that the Congress's power over D.C. is essentially the same as Congress's power over the territories. And so I think you've got that there. But then I think you also have the historical example of territorial judges, Your Honor, who could be appointed by federal authorities and removed by federal authorities. And if you look at the McAllister decision from the Supreme Court in the late 19th century, you'll see that the Supreme Court expressly says that the fact that they can be removed by the President doesn't convert them into federal judges. I'd like you to think about territorial judges because since the early days, well, after the federal court in Puerto Rico was a military court, in the first act, the act of 1901 or 1900, which created the District Court of Puerto Rico, that court had to be appointed by the President and the judge had to be confirmed by the Senate, U.S. Senate. Yes, Your Honor, but I guess if you go back to Chief Justice Marshall's opinion in Cantor nearly 200 years ago, he made quite clear in that opinion, and it's been the law ever since in the Supreme Court, that territorial judges don't exercise the Article III power of the United States, judicial power of the United States in the language of the Constitution, and therefore they don't have to meet the separation of powers requirements of life tenure and no salary reduction. That's been the law of the land since then. Now, sometimes Congress can choose, as a matter of good policy, to adopt procedures that mimic what the Appointments Clause requires, but you can't infer from that that the Appointments Clause requires it. With respect to territorial judges, the Supreme Court has absolutely ruled that. All these 50 years of following the Appointments Clause was a confusion on the part of Congress. Not confusion, Your Honor, a judgment to make, to use the procedure as a matter of sound policy, not constitutional compulsion, and that's just clear. Cantor is unambiguous in so holding. On the part of judges, if I remember correctly, I think the Cantor argument is that they would not be acting pursuant to or under the laws of the United States, rather they're applying principally territorial law. Do you think the distinction of your second example? I don't think so, Your Honor, because if you look at Cantor, the issue there was that the territorial court was applying admiralty law, which in one of the states had to be exclusively in an Article III court, couldn't be in a state court. So I think it was in the face of that that the Supreme Court held that territorial courts aren't exercising judicial power of the United States, and they can't infer admiralty. In my remaining time, if I could, there are three points I'd like to be able to make here. One, I think, focus on the correct test. My friends have suggested that the Buckley test is the correct test, but that skips over the determinative question of whether the officer here is exercising significant authority under territorial law or the law of the United States. To figure out the answer to that question, one looks to the cases where the Supreme Court was actually grappling with that question, Calmore, Bins, Cantor. And the test, Calmore is the modern case, and it sets out a three-part test. It says, did Congress expressly invoke its Article IV territorial power? Did it expressly locate the office in the territorial government as opposed to the federal government? And are the responsibilities of the office strictly territorial in scope, and that the authority is territorial in scope, and the substantive law applies to the territory only? That's the test. If you apply it, PROMESA easily satisfies that this is a territorial officer, not an officer of the United States. And if I could make a point about the contrary, if you look at the test that they urge, and you can find it on page 9. This is akin to bankruptcy law. How is that territorial as opposed to federal? Bankrupt Dakota has traditionally been federal. This is a territorially specific law, Your Honor, in that PROMESA, this bankruptcy, the proceedings here, bankruptcy-like proceedings, apply only to territories, on the face of the law, only to territories, and PROMESA's authority is only territorial in scope. Quite clear. And it just can't be right, the test my friends on the other side use, if you look at page 9 of their reply brief, holding a continuing office created by federal law and exercising significant authority under federal law. If the court were to adopt that test, we would immediately conclude that the self-government of the Virgin Islands and Guam is unconstitutional, because in both of those situations, it's the organic law that Congress enacted that creates the position of legislature, creates the legislative provisions, and allows for direct elections. So all of that is authority exercised pursuant to the laws of the United States in that test. Are those appointments? Their argument, Your Honor, is when that condition I just described is satisfied, they must be appointments in the test. It has nothing to do with appointments. It has nothing to do with elections. I guess what I'm trying to convey, Your Honor, is that under their test, if you are, if you hold a continuing office created by federal law exercising significant authority under federal law, then you must be appointed. You cannot, pursuant to the appointments clause, you can't, offices can't be filled in any other way. And that's why their test is just wrong. And I think you can go, and why you can't line it up with American history. If the promessa board is a federal entity, does the appointments clause apply automatically? So I think it depends on what we mean by federal entity, Your Honor. I'll tell you what the test, and I have read Altair, by the way, which we haven't talked about, and LeBron say, they say, number one, it's a special law. Number two, it's a furtherance of federal government objectives. And number three, there's a retention of the authority to appoint a majority of the board of directors. Yes, Your Honor. Does the promessa meet that standard? I think respectfully, Your Honor, that's not the correct test. That's the test that my friend Mr. Olson is urging, derived from Buckley, which has nothing to do with the question of whether an officer is territorial or federal, and LeBron, which also has nothing to do with whether an officer is territorial or federal. The correct test is the Palmore test, which is about whether officers are territorial or federal. And I see my time is about to expire, but I may just make one point about Palmore. My friends on the other side say, well, you can ignore Palmore because that was about the application of local law. But the whole point in Palmore was that the D.C. code that was being used to prosecute the criminal defendant was a code passed by the Congress. Now, it was local law. It applied just to D.C., but it was passed by the Congress. And what the Supreme Court said is that was territorial law, effectively, not the law of the United States, and, therefore, it didn't have to be tried in an Article III court. And it's exactly the same thing here. Should we ignore Altair altogether? Yes, it's an incorrect test, and I don't think the court should follow it. I thought you'd say that. We've been talking about examples over several hundred years of history. It seems to me the other side's best example is the original Congress in the Northwest Territory change in the way that, before and after the Constitution, the governor was selected. I think, as I gather from your brief, your principal response to that is that the fact that Congress chose to follow the appointment procedure didn't mean that we should infer that Congress felt it had to do so. Is that the counterargument? We have three points to make, but that's at the core of it. The first one is Congress had to do something because the prior appointments under the Articles of Confederation were by the Confederation of Congress, which no longer existed. So it had to conform to the new Constitution. It had to find somebody else to do the appointment. That's point one. And then point two is the same point I tried to make about inferior officers generally. The very same ordinance created a territorial legislature that was voted on by the people of the state, excuse me, of the territory, and they would be inferior officers. And so if Congress really thought the appointments clause applied, it couldn't have taken that step. What Congress is doing here, I submit, from the very first time it acted on the Northwest Ordinance and throughout our history is doing exactly what Sanchez Valle said Article IV gives Congress the ability to do, to adapt the forms of government to meet local needs in the territories. Now, that can involve borrowing a salutary policy, things like advice and consent proceedings, when they make sense. But nobody has ever said, there's no case in American history that has ever held or even suggested that the appointments clause applies to territorial officers. And I just think, especially after Sanchez Valle, there's no way to get to that conclusion. Thank you. Mr. Wall, good afternoon. Good afternoon, Your Honor. May it please the Court. The bondholders have two arguments. The first concerns the appointments clause, regardless of what kind of entity the board is. The second is that the board is a federal entity. I want to take them in turn, but start with the appointments clause. And your question, Judge Kayada, time it again. The Supreme Court has found that some separation of powers constraint that applies at the federal level does not govern with respect to the territories. You can have non-delegation in Cincinnati Soap and Hineson. You can have executive officers who aren't answerable to the President, that's Snow in 1871. You can have territorial courts that aren't Article III officers, that's as early Cantor in 1821, and then Engelbrecht and Palmar. And in each of those cases, what the Supreme Court is doing is not actually liberty undermining, it's liberty preserving. By finding that the Congress wasn't required to replicate the federal system in the territories, it has left Congress free to devolve those decisions to the people of the territories, as they have in Puerto Rico. And the inevitable implication of the other side's view, try as they might to avoid it, is that if the appointments clause applies, and with it other separation of powers constraints, home rule is unconstitutional. Every major federal office holder in the territories needs to be directly federally selected by the President and confirmed by the United States Senate. The D.C. Council and the D.C. Mayor are officers on their view. They exercise at least as much authority or more than the Board under federal law. The governors of the territories, as Mr. Verily said, in Guam and Virgin Islands, they're tasked with enforcing both local and federal law by federal statute. They would become unconstitutional overnight. Along with territorial legislatures, which are popularly elected, they don't comply with the appointments clause, territorial courts, and, indeed, governors. And the only way the other side gets around that is to say, well, elections are different. Largely? Well, Judge Trant, I think the point is that if they're right, that you just look at whether the Buckley test is satisfied, all of those officials who are currently being elected satisfy the Buckley test. They exercise significant authority, and they do so only pursuant to federal law. This was Judge Thompson's question. And I think I heard Mr. Olson say, of course, everything traces back to federal law. And he's right about that, but the problem is it gives away the game. All of those offices are created by virtue of federal statute. They hold power by virtue of federal statute. And what the Supreme Court said in Sanchez Valle, in response to exactly the same argument, was, look, Puerto Rico is not a dual sovereign for purposes of the double jeopardy clause. Well, so too are the appointments clause. But why doesn't the election, if Congress delegates an Article IV, the power to the local territories to hold elections, why isn't that fundamentally different? Well, because I think the other point is you look at whether the Buckley test is satisfied. And if it is, you couldn't devolve an election to the people of Puerto Rico any more than you could elect Supreme Court justices who are also officers under the appointments clause. Let me give you an example. The Puerto Rico governor was obviously appointed up until 1947, right? Congress then passes a statute, and by federal law says the people of Puerto Rico may elect the governor. At the moment that statute was passed, none of the duties of the Puerto Rico governor were altered, and the method of selection was altered only by virtue of federal law. Everything about the duties and the method of selection was dictated by federal law. And yet their position seems to be that even though he's exercising the same significant authority the day after that statute is passed as the day before, that somehow he doesn't satisfy the Buckley test. But he's equally exercising significant authority pursuant to federal law. Here's the possible distinction that I'm having trouble sort of thinking through, which is you have on the one hand the federal government saying, we're going to give you, the people of Puerto Rico, the ability to elect your own officials and make your own laws that govern what goes on in the territory. So you've got that. Then you've got, we're going to pass a federal law, and we're going to pick our guy to come down and pursuant to that federal law basically run the finances of the whole island, notwithstanding what the elected official says. There seems to be a lot more federal in that second model than there is in the first model, and a lot more concerns that the manner in which the structural restrictions in the Constitution may actually protect individuals' rights or groups' rights could be implicated more by when we're picking our guy who's only answerable to us and you have to answer to him. That's a little different. So, Judge Carr, I understand the question, but I guess I want to fight the premise a little bit, which is Congress can either structure a territorial government for itself, as it has in many of the other territories, or it may devolve that choice in various ways as it has in Puerto Rico. Either one of those is an exercise of Congress's Article IV power, and either represents a federal choice, and in either case, the officeholders ultimately trace their authority back to federal law. So I don't think there's any case in the Supreme Court, and I don't think there's anything in logic that commends a distinction between when Congress makes one choice and when it makes the other. In a sense, it has structured the territorial government in either instance, and it is federal law that gives that local law its force. And I think for the other side to say in their briefs, look, in Puerto Rico, their power is emanating from the local people, and so that doesn't trigger the Appointments Clause, I think that's exactly the same argument that was before the Supreme Court in Sanchez Valle. It's calling double jeopardy. Yes, but the Supreme Court made it very clear that it was only talking about double jeopardy. Well, yes and no, Judge Correa. It can't be both. Well, yes, it was about the Double Jeopardy Clause. No, nothing about the Supreme Court's reasoning turned on the Double Jeopardy Clause. The Supreme Court didn't suggest that Puerto Rico drifts in and out of dual sovereignty status depending on which clause of the Constitution you pick. Its reasoning rested on the fact that when Puerto Rico said, it's our prosecutors and our sovereignty at issue, so we're dual sovereigns and you shouldn't treat us like the United States. The six members of the eight-member Supreme Court who decided the case, it didn't turn on double jeopardy at all. What they said was, no, if you trace back the authority of the Puerto Rico law, you land on the United States law, and hence they can't be dual sovereigns for double jeopardy purposes. I don't think this Court is going to want to say that Puerto Rico drifts in and out of dual sovereign status depending on which constitutional clause you pick. Nothing about the Court's reasoning in Sanchez Valle was specific to the Double Jeopardy Clause. Because I read a different case. I mean, again, I just think if you look at the reasoning of the Court, the reasoning of the Court was these prosecutors were deriving their power from federal law. And when Mr. Wilson says, of course, everything in Puerto Rico traces back to federal law, he's absolutely right. But I don't think that's going to allow the Court to distinguish this case from Sanchez Valle, or even Snow. I mean, the Supreme Court said it as early as 1871. And I just want to point out that the consequences of that for the territories would be severe, taken to its logical conclusion. The view of the bondholders is that every major officeholder in the territories has got to be picked by the President and confirmed by the United States Senate. And as I say, every time the Congress They have their election exception. In other words, they say no to what you just said. They say they don't all fit. Congress can give to the people of Puerto Rico the ability to elect. But if Congress wants Washington to do the selecting, then we've got this thing called the Constitution that says how Washington makes picks. Yeah, I guess two things. One, that's not going to get to the other territories. The governors of Guam and the Virgin Islands are tasked by federal statute with applying both local and federal law. The offices there are created by federal statute. Those are empowered by federal statute. I think they're going to struggle with D.C. on that view and the Home Rule Act in the 1970s. But even setting that aside, the fact that then they say, well, look, but we're different in Puerto Rico because Congress has allowed the people of Puerto Rico to interpose the Constitution, and they have elections, and that changes the game. As I was trying to say earlier, I just think that's going to collapse on real scrutiny because the basis of that claim is that by putting power in the hands of the people, the power of these elected officials in Puerto Rico derives from local law and not from federal law, and that's the same claim the court had before in Sanchez Ryan. Put that in real terms, though. If you're the governor of Puerto Rico and you're appointed by Washington as the president of the United States, then when you get up each day to do your job and you think, who could remove me from my job? Who am I really answerable to? It's Washington. But if you're the governor of Puerto Rico and you're elected pursuant to by Puerto Ricans and you get up each day and you say, who can remove me from my office? It's not Washington. Why isn't that a practical way of distinguishing between what is being an officer of the United States acting pursuant to federal authority and being a territorial officer whose focus is on the laws made by the people in Puerto Rico? I think you could have said that, Judge Kayada, as early as the Cantor case in 1821 about territorial courts. Early territorial judges, many of them were presidentially appointed and Senate-confirmed, and they were hearing cases under federal law, in some cases almost only federal law. And the court, looking at that in Cantor and then again in Palmore, didn't treat any of that as what was important. It asked three questions, all of which are satisfied here. One, which power did Congress invoke? Did it invoke Article I or did it invoke Article IV? And two, where did it locate the office? Did it locate it in the federal government or locate it in the territorial government? And three, what powers did it invest in the office? And are the territorial courts only hearing things that apply in the territories, just as the board is only doing things that apply in Puerto Rico? All three of those, I think, are satisfied here. And so for the reasons which you really gave, I think that test in Palmore is always where the court has looked in trying to divide territorial from federal. It hasn't looked at Buckley. That's applied only at the federal level and only to determine the difference between an officer and an employee. You couldn't extend that to territories any more than all of the other separation of powers cases. And it's never looked to the LeBron test. And the Altair court did look to the LeBron test but never explained why, never took the predicate question of why that's the right test. And the problem with LeBron is it looks to get at whether you're governmental or private. And in that situation, it makes a lot of sense to ask about factors like, does the entity further governmental objectives? Is it subject to continuing governmental control? And, yes, those are satisfied here because no one in this courtroom disputes that the board is a governmental entity. The question is of which government. And so the LeBron test is sort of rigged, I think, to produce the answer that they want. But it can't possibly be a sensible test for federal versus territorial because neither of those factors gets at which government the board is a part of. And I think that's what the Palmore test does. By the way, and as was really said, you're dealing with D.C. courts, which, by the way, were implementing the D.C. Code, which was a federal statute passed by Congress. They were adjudicating only a federal law. And the Supreme Court didn't say, well, they're executing federal law. It didn't look to the method of their appointment, and it never has in any of these cases. It said which power did Congress exercise, where did it say that it was located in the office. We give substantial deference to those. That's Palmore and Benz. But we also want to look and say, do the powers exceed the scope of what Congress exercised? And the bondholders here, not even Clinton, have made no argument that PROMESA exceeds Congress's Article IV powers, that Congress vested anything more in the board than it could have properly vested given its plenary power over the territories. Did Congress need to get the president involved at all based upon your theory? I think the Congress could have chosen other selection methods, just as Mr. Rooley was saying they have historically. Sometimes they've devolved it to the governor of a territory. Congress had just selected seven people and said, here are the boards. Well, I think direct congressional selection would have raised a different and more difficult question about whether Congress was itself trying to execute the law on the territories, and that's a different question. Well, it's related. Your argument is that under Article IV is pretty preliminary. It is, except our submission to the court is much more modest, which is that at least on six different occasions, the Supreme Court has said that when Congress legislates and structures a territorial government, the structures of the federal separation powers don't apply. Now, it hasn't gone further and addressed the question of, can Congress itself exercise executive or judicial power in the territories? And they've made no argument that the statute does that. So I don't think we need to make the bolder claim, and I think it's a more difficult question. If I could say one word before I sit down about the remedy and the consequences here, because it's very serious. The parties agree that whatever the court decides, it should stay its mandate in order to avoid calamitous consequences in Puerto Rico. If we stay our mandate, what happens to the business of the ProMesa in the meantime? I think it's a difficult question, Judge Correa, which we'd want to brief. I think our position would be that the board could continue to function and needs to be able to continue to function in order to provide stability to the island. It is in the middle of the most complex restructuring in United States history. Much has been accomplished and much remains to be done. The Covina Plan is coming up for approval in January. It's got a major sticking point in the bankruptcy, as this court knows. If it violates the appointments clause, what authority would those board members have? We respectfully submit, Judge Thompson, that it doesn't violate the appointments clause and that the board should be able to continue to operate. I think most important, the court should not dismiss the Title III petitions, and certainly not just on the sparse briefing here if it has any interest in that. There should be more briefing from the parties. That would undo a tremendous amount of work that I think has achieved real progress in getting fiscal stability for the island. If the bondholders are right, if this court doesn't stay its mandate or if the court dismisses the Title III petitions, the bondholders are seeking billions of dollars. At this very moment, Puerto Rico has $3.6 billion in its account with the Department of Treasury. The bondholders are seeking to have that money paid to them before essential services in Puerto Rico. That's money that wouldn't be available for schools, nurses, firefighters, disaster relief, or even keeping the government open. I cannot stress to the court enough, on behalf of the United States, the severe consequences that would flow. Is there any precedent for staying and continuing the board's working? There are, and there are a couple of cases cited in the briefs. But if the court has more interest in that remedy, though obviously we think the court should never get there, we would say given the importance of that question to the parties and the ongoing health of Puerto Rico, we would want the opportunity to brief that. These petitions should not be dismissed, and the court should stay its mandate. Could you go back to a question that Judge Thompson asked you? As I understand the question, you were asked, could Congress simply cite Article IV and pick itself without the president's imprimatur, the officers of the board? And I think I heard you say that would create another problem, and they maybe couldn't do it. That caught my attention, because it does seem they've come pretty close to doing that here, in terms of the way this was structured. They didn't pick the people, but they made the list so tiny it's getting towards that end of the spectrum. So I don't think that's right, Judge Calleada. There's both an old analog and a modern one for this. In the D.C. courts, the president picks from lists submitted by a judicial commission. That's true today. It has been for quite some time. And under the Northwest Ordinance, the president picked certain officials in the territorial government from lists submitted by Congress. Where the president, certainly as here, is able to go back and forth, ask for more names, and is able to just reject the list altogether, put forward his or her nominees, and have them Senate confirmed, we would say that is not itself enough, given the historical analogs, to be a problem. But I would point out, I don't think the court needs to get into any of that, because all of that is raised by the bondholders only in support of their argument that these are principal officers rather than inferior officers if the Appointments Clause applies. The United States agrees with them on that. It's just our basic submission is the Appointments Clause doesn't apply any more than the other federal separation of powers constraints apply in the territories. It never applied in the territories. No court, neither the Supreme Court, nor this court, nor any other court has ever held otherwise. Has any court held to the contrary? Well, again... Well, you're actually not correct anyway, because we have the Altair case. Well, I think the Altair case, Judge Jury arrested on the fact that it was a federal entity under the LeBron test for the reasons I've given. I don't think that makes any sense. And the Altair court didn't explain why it was picking the LeBron test. Their initial argument is, even when you get to that, whether it's territorial or federal, the Appointments Clause applies. And I guess what I'm saying is, no, no one has ever brought a challenge of that kind. So I'm not aware of any court saying that the Appointments Clause does or doesn't apply in the territories. But every time somebody has pointed to one of the other separation of powers constraints that applies at the federal level and said that applies to the way Congress structures a territorial government, the Supreme Court has rejected it. Cincinnati Soap, Heinsohn, Snow, Cantor, Albrecht, Palmore, time and again. We're not talking about whether the separation of powers under the U.S. Constitution model is built into the Puerto Rican government. So I understand your argument that Congress's plenary powers leave it with the option of how it structures a territorial government. But I think the issue here is not the structural powers of the territorial government, but rather the structural limitations on how Congress exercises its power. And surely you're not saying that those structural limitations can be ignored in toto when Congress passes legislation that concerns a territory. Well, I guess I should have been more specific, Judge Kyle. It is certainly true that under Article I, in order for Congress to act at all, it's got to undergo bicameralism and presentment. That's just what's necessary for Congress to act. But every time somebody has come forward, pointed to one of the structural clauses in Article I, Article II, Article III, and said that limits the substance of what Congress may do for the territories under Article IV when it creates a territorial government, the Supreme Court has rejected that claim. And I'm not aware if any court... So you're down to whether this limitation, in other words the appointments clause, under, by analogy to what you just said, it would seem to pivot on whether that was a limitation on the substance of what Congress would do, or rather a limitation on how Congress could do that substance. I think that's right, although the only limit that I'm aware of that's sort of procedural on Congress is bicameralism and presentment. Nobody's ever raised a claim of that kind. But every time somebody's come in and said, well, Congress can't do that in substance because of Article I's vesting clause, the court rejected it in Cincinnati-Sylvania-Hudson. Congress can't create prosecutors not answerable to the President under Article II. The Supreme Court rejected it in Snow. You can't have territorial courts that are Article III. They look like federal judges. They're hearing federal cases. That's early as 1821. Marshall rejected it in Canter and then Engelbrecht in Pallmore. So I do think there's a very important distinction between the constraint procedural on how Congress has to act in order to do anything and taking all of these substantive constraints that apply at the federal level to the substance of what Congress does and saying those translate equally to the territories. Supreme Court's rejected it time and again, and they don't have any argument that the Appointments Clause should be different. Indeed, quite the opposite. The purpose of the Appointments Clause is both to preserve the legislative role with respect to principal officers and ensure accountability when Congress devolves out the appointment of inferior officers. Neither one of those purposes has any applicability in the territory where Congress exercises plenty of legislative power, and there is not one word in their briefs, Judge Cayetano, not one, about why the purposes of the Appointments Clause are implicated in the territories. Thank you. Thank you. Mr. Hernández Mayoral. Good afternoon. Good afternoon. May it please the Court. From the briefs and oral arguments, we could summarize the party's position. There's one side arguing that Article 4 grants Congress plenary authority over the territories, and thus Article 2 does not apply, and the other countering that Article 2 applies nonetheless if the officers perform federal tasks. The Popular Democratic Party does not take sides in that controversy. It comes here because in developing its holding that board members are not federal officers, the district court cited a 19th century case law for the proposition that Congress can amend the acts and abrogate laws of territorial legislatures, and exercise full and complete legislative authority over the people of the territories and over the parliaments of the territorial governments. That is the subject of a very heated political debate in Puerto Rico, but it's not the issue in this case, and unnecessary to its adjudication. Courts should not weigh in through dicta on a politically charged issue without a case of controversy centered on it, and where the stakeholders have an opportunity to address it. Therefore, we ask this court not to go there. When the Supreme Court made those pronouncements, there existed only one concept of territory, built around the notion of empty land populated by migration from the existing states, organized by Congress for eventual admission as states. That is the context of the Dred Scott quote that Justice Reyes so avidly reminds us of, that no power is given to acquire a territory to be held and governed permanently in that character. The dawn of the 20th century confronted the courts with a new type of territory, acquired by the United States without the intention of eventual statehood. Consequently, the Supreme Court drafted a distinction between incorporated and unincorporated territories. The concept of territorial government developed even further when in 1950, Congress passed Public Law 600 authorizing the people of Puerto Rico to adopt its constitution. In 2016, the Supreme Court in Sanchez Valle described that constitutional process as of great significance, one that created a new political entity and made Puerto Rico sovereign in one commonly understood sense of that term. The court added that through this process, Congress relinquished its control over the commonwealth's local affairs, granting Puerto Rico a measure of autonomy comparable to that possessed by the states. This court in U.S. v. Maldonado Burgos stressed that in Sanchez Valle, the Supreme Court took pains to acknowledge the distinctive, indeed exceptional status as a self-governing commonwealth. These statements by the Supreme Court and this court cannot be read as hollow phrases. Can Puerto Rico become sovereign in a common sense of the term, as the Supreme Court says it did, and Congress maintain the power to abrogate its laws? Can Congress continue to exercise powers over Puerto Rico the Supreme Court says were relinquished? If the commonwealth is a new political entity through a process of great significance, full of distinctiveness and exceptionality, are those 19th century cases still applicable to Puerto Rico? Or have new avenues of territorial relationships developed and may continue to develop, allowing for a permanent non-state relationship within the U.S. Federation, the so-called wide variety of futures Sanchez Valle talks about? Do you want the board to be constitutional or unconstitutional? Excuse me? Do you want the board constitutional or unconstitutional? Well, the party is not taking a side on that issue here, Your Honor. What we want to convey is that the issue about whether Congress can amend Puerto Rican laws that the district court went into through dicta are very complex and with profound implications for the people of Puerto Rico. And as such, the court should not approach them incidentally and unbriefed, as dicta in resolving a legal issue that does not require it. What is before this court today is whether the board members are federal officers or not. And that depends mainly on what it is that they do and not whether, not at all, whether in 1879 Congress could annul the laws of a temporary territory of its own creation. Thank you. Thank you. Mr. Martinez? Good afternoon. Good afternoon, Your Honor. We want to begin quickly by thanking the court on behalf of Mike Lyons for allowing us to intervene as amnesty and to having us be heard in this hearing. And as a matter of fact, I want to go directly into an argument that hasn't been challenged, but a police suggest that Mike Lyons, elected officers of Puerto Rico, would be subject to the appointments clause if the appointments clause were to apply to territorial officers. And not only, as Judge DelRoya highlighted, is there a significant distinction between elected and appointed officers, and appointed officers being the only instance in which separation of powers issues are implicated because those issues are not implicated when the people are directly selecting. But also, there is an artificial construct that means to suggest that because ultimately the power and the authority to enact the constitutional laws in Puerto Rico under which Mike Lyons exercised authority, that this means that federal law is their ultimate charter and it is not. To be sure, the authority to create those laws emanates from Congress, and Congress gives it and Congress takes it away. But while the authority exists, territorial law and Puerto Rico law is the same, separate and different and distinguishable from federal law. When this court decides a diversity case from Puerto Rico, a tort case under the Puerto Rico Civil Code, nobody would suggest that the court is applying federal law. The court is applying territorial law. And territorial law is an independent source of power, an independent source of authority, and I believe that it is a stretch. But the question is, from where does it emanate? The authority that Mike Lyons exercised to be legislator emanates from territorial law. The authority to create that territorial law emanates from Congress. But I believe that it is a stretch to say that the charter of their authority goes back to federal law because that would make federal law and Puerto Rico law indistinguishable. It would suggest that Puerto Rico law is a sort or a means or a type of federal law, which it's not, nor is the law of any territory. So, therefore, I believe that there is no way that officers exercising elective office in Puerto Rico today can be deemed federal officers, principal federal officers, which is different from when Puerto Rico was operating under a charter of Congress, under the Jones Act or the Fort Acrac, because the source and the charter of authority was directly a federal statute. As a matter of fact, once the distinction... If Congress repealed the act authorizing self-governance... If Congress repealed that act and decided that those officers and those offices were to be held by appointed officers, then the appointments clause would apply because the source of authority and the charter of authority of those new officers that would rule over Puerto Rico or over any territory would be directly federal law and not territorial law. But that is not the status quo. That is not what we have now. As a matter of fact, separation of powers is at the heart of any appointment for significant... the exercise of any significant federal authority in any continuous significant federal office. And it strikes me as odd the argument that flat out Congress's plenary authority, which by the way, plenary is not a word or plenary authority that appears in the Constitution. It's an unfortunate term that has been coined by the courts over the years. But Congress does have the authority to decide and dispose of territories, of course, approving and acting legislation. It cannot dispose of the territories because the committee issued a resolution. It has to go to the president. All the structural provisions required for the enactment of any statute apply to Congress when Congress legislates for the territories. And I don't recall having read any charter or any government scheme that was enacted by Congress that did not go through an official act of Congress that did not go to the president. And to say that Puerto Rico is not entitled to separation of powers protection because it is a territory and because the territory clause applies, every single scholar that has addressed separation of powers has said that separation of powers is the antidote and the cure against tyranny. To say that Congress can legislate for the territories, can legislate a monarchy for the territories or any other autocratic regime because separation of powers is not something that the American citizens of Puerto Rico enjoy, is to say that people in territory deserve to live under tyranny. Thank you, Your Honor. Thank you. Mr. Olsen, I think you have the floor. Thank you, Your Honor. That's correct. Our opponents keep saying our test is such and such. We are not creating any test at all. We are quoting the precise language of Supreme Court decisions in the Buckley, Freytag, Lucia cases, the Metropolitan Airports Authority case, the LeBlanc case. Our opponents would like to change the test, but it's not our test. It's the Supreme Court's test. And the test is clear and it's repeated and it's binding on this court. Is there a territorial exception to Article 4? Chief Justice Marshall didn't think so. The Freytag Court didn't think so. The Freytag Court said since the early 1800s, Congress regularly appointed non-Article 3 territorial courts the authority to appoint their own clerks, territorial courts the authority to appoint their own clerks who were, at least since 1839, inferior officers within the meaning of the Appointments Clause. That's the language of the United States Supreme Court. What do you say? Mr. Williams, Sir, Wall just cited as examples Guam and the Virgin Islands. And they said the models of government established there in the way they're established by Congress would not survive the test that you're urging us to adopt. I submit that to the extent that the test would be applied to the Virgin Islands or any other property or territory of the United States, what the Supreme Court has said the test is, is the test today. Do you agree that if we were to adopt that test in this case, it would follow as has been urged by the other side that we would at the very least cast serious doubt on the established governments in both those areas? I think that the answer to that is that the test will not be established by this court. The test that the Supreme Court has established will be applied by this court. The test is clear. Let me put it this way then. If the Supreme Court agreed 100% with you on this test and it were the law of the land, what then of the governments of Guam and the Virgin Islands? To the extent that that test applies and if there's significant authority executed by a continual official, continuous official, a significant authority under the laws of the United States, then the appointment clause applies. I'm not hearing any offer of any comfort from you on this point. I'm hearing it will be what it will be. I'm not hearing, oh, there's no problem because those governments survived that test. I would have to look at a particular provision or a particular official or something like that, but there is no territorial exception. The test is what the Supreme Court said repeatedly and repeated again in the Lucia case just six months ago. The question that you asked, I think, focused right on it with respect to, it's not the question of plenary authority. It's the question of how the authority is being exercised. That's exactly the language that the Supreme Court used in the Chadha decision. The plenary authority of Congress over aliens is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power. We submit that Congress in this case has performed a permissible exercise of a substantive authority, but the way it has gone about doing it, it violates the structural provisions of the Constitution and would have been stricken under the Chadha decision. Can you tell me, I'm sure you said it before, but I would like to be refreshed on what is your solution to this allegation that there will be cow-cows in Puerto Rico because of Provenza being left without a head? I'm not sure I understood the point. Well, they say, your opponents say, that if your viewpoints prevail, that Provenza will be left, will not be able to operate. The court, as it did, as the Supreme Court did in Northern Pipeline, as the Supreme Court did in Buckley, as the Supreme Court has done on other occasions, that you may suspend or postpone the operation of your decision until Congress has an opportunity to comply with the Constitution. Why wouldn't they do that for everything that has happened before that? Assuming we rule in your favor, assuming Congress then passes a law saying that they have to be appointed by the President and confirmed by the Senate, what about all the business of the board up to now? What a constitutionally appointed board, and the court has discussed this frequently, I think it's also discussed in the Free Enterprise Fund case, is that the new board can validate or ratify the actions of the unconstitutionally appointed board, provided they're acting constitutionally and independently. Now, I have to assume that things are not going to operate overnight in Congress on this, but there's going to be a period, perhaps several months, before a solution is found. What happens to the business of the board in the meantime? The court's decision, as we suggested in our briefs, and in the district court, you can stay the effect of your decision, and the board can continue to make decisions, but subject to the fact that substantively, ultimately, those decisions are going to have to be approved by the constitutionally appointed board. The import of what our opponents are saying here is that the separation of powers does not apply to the territories. That's contrary to repeated Supreme Court decisions, and it would mean that the citizens of Puerto Rico are not protected by the core provisions of the constitution, which were put there in order to protect people's liberty and justice. That is what the Supreme Court said again and again, and I heard one of the members of the court saying, what if Congress just creates this board and then picks the people to serve on that board? That's exactly what happened in the Metropolitan Washington Airport's authority, and that's exactly what Justice Scalia talked about in his concurring opinion, and that's precisely what the founders of the constitution were concerned about and called the very definition of tyranny. There should be a separate appointment process for people who exercise significant authority under the constitution of the United States. Applying that standard, that fundamental standard of separation of powers with respect to this board, which was created by Congress to solve a national problem, not just a purely local problem, creating officers appointed by the president, removable by the president, subject to the control and take care clause of the constitution by the president, exercising the same powers that the Supreme Court talked about just a few months ago in the Lucia case. There's no question this is a federal board solving federal problems. These are federal officers of the United States. They need to be appointed consistent with the constitution of the United States, and that is not a bad thing. That is a good thing. That is why the separation of powers existed, and that's why the appointments clause is the center of the separation of powers. Thank you, Your Honor. Thank you.